Filed 12/1/20  In re F.N. CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re F.N., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>F.N.,<br><br>        Defendant and Appellant. | A156834, A157674, A157936<br><br>(Contra Costa County<br>Super. Ct. No. J17-00123) |

After sustaining allegations that F.N. committed three robberies and a carjacking, and that he personally used a firearm in the commission of each offense, the juvenile court declared him a ward of the court pursuant to Welfare and Institutions Code section 602 and committed him to the Department of Corrections and Rehabilitation, Division of Juvenile Justice (DJJ) for a maximum term of confinement of 52 years.

On appeal,[1] F.N. (1) challenges his commitment to DJJ on the ground there was no evidence the commitment would benefit him due to his

---

[1] F.N. appeals from three separate juvenile court orders, including the original disposition order and two amended disposition orders.  The appeals were consolidated by order of this court on September 6, 2019.

1

intellectual disability, and (2) contends, pursuant to Penal Code section 654, the juvenile court should have stayed execution of the term of commitment imposed for one of the robberies and corresponding firearm enhancement.[2] We affirm.

## BACKGROUND

On the night of October 1, 2015, then 16-year-old F.N. and his friend R.R. contacted G.R., and her two friends, M.V. and C.L. "to go hang out at a park" to drink and "smoke." M.V. had a car, and the three girls drove to pick up F.N. and R.R. Upon arrival at the park, M.V. parked "a good distance away" from some benches. While walking to the benches, F.N. and R.R. walked ahead of the three girls whispering to each other.

About 15 minutes after they arrived, R.R., began "messing" with G.R.'s phone, by picking it up, "putting it down and picking it back up," and at one point, he erased his phone number from her phone. G.R. asked why he was "messing around," and R.R. grabbed the phone once again and put it in his pocket. She asked him to return her phone, and R.R. refused.

F.N., in turn, proceeded to take G.R.'s purse from under her arm.

At this point, R.R. pulled out a gun and told F.N. to " 'Whip it out,' " and F.N. also pulled out a gun. The two pointed their guns at the three girls,

_____

[2] In his opening brief, F.N. also maintained the juvenile court failed to find he was a child with exceptional needs and that he must undergo an individualized education program (IEP) assessment. However, he has conceded this issue is moot, given that his twenty-third birthday has now passed. (See Ed. Code, § 56026 [defining " 'Individuals with exceptional needs' " as those who, among other things, come within certain age categories, and caps the age limit at 23].) We therefore need not, and do not, address this issue. (See *In re Jessica K.* (2000) 79 Cal.App.4th 1313, 1315–1316.)

who were standing about five feet away, demanded their belongings, and took C.L.'s purse and cell phone, and M.V.'s cell phone.

R.R. and F.N. then demanded M.V.'s car keys. M.V. threw the keys to the ground, and R.R. and F.N. both ran towards them. After R.R. picked up the keys, he and F.N. proceeded to the car. Two of the girls followed, pleading with the boys not to take the car, while the third ran to get help. M.V. was "crying, begging him to not take" the car. R.R. told her to " 'back the fuck up,' " and when he arrived at the driver's side door, he pointed his gun at her and fired a shot over her head. M.V. was standing only about four feet away. R.R. and F.N. then drove away.

During a search of F.N.'s residence, officers seized a .357-caliber revolver and various ammunition. The victims could not identify the gun as that used in the commission of the offenses.

The district attorney filed a Welfare and Institutions Code section 602 wardship petition alleging F.N. committed four felonies— three second degree robberies (Pen Code, §§ 211, 212.5, subd. (c)) and one carjacking (*id.*, § 215, subd. (a))—and that he personally used a firearm in the commission of each felony (*id.*, § 12022.53, subd. (b)).

The court sustained the petition as alleged.

The probation department filed a report in preparation for the disposition hearing. The report noted F.N. had refused to speak about the underlying offenses, so the probation officer was "unable to determine if [the minor] is willing to acknowledge his wrongdoing or take responsibility for his action." Police described F.N.'s behavior, upon his arrest, as "feigning 'indifference, yawning, and repeatedly brushing imagined debris off his pants.' "

The probation report also outlined numerous inconsistencies in what minor told the probation department and his reported behavior. Except for two occasions, minor denied drinking alcohol. However, his mother stated he was given alcohol at family gatherings and the detention facility documented F.N. "as being in possession of 'pruno,' " or prison wine. F.N. said he began sporadically smoking marijuana at age 16, but "asserted that he could stop . . . and is not addicted." However, the detention facility documented minor as "being in possession . . . of lighted articles he was smoking on two occasions." F.N. stated he rarely got angry and when he did, "he breathes in and out until he calms down." However, his mother believed "he could benefit from counseling to address his anger," and since his detention, he had "two documented fights." Additionally, a detention facility incident report stated he " 'is a constant management problem on the building and fails to improve his behavior after multiple formal and informal disciplines.' " F.N. also said, since being detained, he had "attended school continuously." However, detention center records indicated he was "not currently enrolled in academics." F.N. was enrolled in a program geared toward substance abuse, stress management and job development but was going to "be dropped from the program" due to his lack of attendance, attending only 20 out of the required 60 classes. F.N. also attended a workforce readiness program where he had attained 10.5 hours of credit.

Given the "misrepresentations of his behavior and continued risky behavior," his age (he was 21 years old at the time), and "criminogenic needs," probation recommended DJJ as "the most appropriate course of action." Due to his age, F.N. was "ineligible for any other programming the Probation Department offers and was therefore not screened" for anything other than DJJ. Probation also "considered [minor's] psychological

4

evaluation," which highlighted his "intellectual impairments." This, "coupled with the concerns expressed by Probation," suggested "any intervention should be of an intensive nature, and involve housing him in a safe and secure facility while receiving treatment."

Specifically, probation outlined several programs that "effect changes" in a youth's "typical patterns of thinking" and "reduce aggression." F.N. would also participate in programs that focused on "active journaling and victim awareness . . . to strengthen his cognitive comprehension of the consequences of his actions," and allow him to obtain his high school diploma and upon completion have access to college courses or vocational training.

On the eve of the disposition hearing, F.N. filed a motion "toward appropriate disposition." (Capitalization and boldface omitted.) The supporting memorandum detailed his childhood history and family background, including his father's conviction and subsequent federal prison sentence, the family's financial struggles, and his own "mental health issues." Counsel maintained the least restrictive confinement was in the minor's best interest, and rather than a DJJ commitment, F.N. "should be placed on formal probation and provided with appropriate terms and conditions to ensure he is provided with the support and guidance he needs," such as the East Bay Regional Center—an outpatient program geared toward individuals with intellectual disabilities, cerebral palsy, epilepsy, and autism, whereby participants can "engage in activities of their choice, such as work, volunteering, education, training, or leisure."[3]

---

[3] Among other things, counsel attached Dr. Everev's report, as well as F.N.'s report cards, to the motion. The report cards showed grades ranging from D to A-. He received four D's, four D+'s, 12 C-'s, 10 C's, three C+'s, eight B-'s, nine B's, and three A-'s. He needed 75 credits to graduate from high school.

At the disposition hearing,[4] F.N.'s counsel called several witnesses, including a former teacher, F.N.'s mother, two neuropsychologists, and a professor of psychology.

Jacqueline Barrow, F.N.'s former teacher in an independent studies program, testified she met with the minor one hour a week, over the course of three years—from eighth grade to eleventh grade—to give F.N. his homework and correct his assignments. When she first began meeting with F.N., his test scores for reading and in math "were below [a] fourth-grade level," and by the time she no longer met with him, he "was able to get up to about sixth-grade level . . . with the reading, and the math was a little bit lower."

F.N.'s mother testified about F.N.'s childhood. His father was arrested on his sixth birthday. He attended at least two years of therapy, after his father was arrested. Mother thought his grades, which had been lower in third or fourth grade, had gone up since he entered his independent study

---

[4] Several intervening proceedings led to a delay between the time the commitment of the crime (2015) and the disposition (2019): In 2016, the district attorney filed a felony complaint alleging F.N. committed a carjacking and three counts of second degree robbery. F.N. then moved to remand the case to juvenile court pursuant to Proposition 57. In early 2017, the trial court granted the motion, and the case was remanded to the juvenile court. Next, the district attorney simultaneously filed a Welfare and Institutions Code section 602 wardship petition and a motion to transfer the case back to adult court. Meanwhile, the juvenile court proceedings were stayed pending resolution of the transfer proceedings. In April 2018, the district attorney withdrew the motion to transfer, and the juvenile court proceedings resumed. Four months later, during F.N.'s contested jurisdiction hearing, minor's counsel filed a motion to disqualify the juvenile court judge and the proceedings were once again suspended. That challenge was denied a month later, and proceedings once again resumed. After the court sustained the allegations in the petition, the disposition hearing was set. This hearing, which was set for October 2018, was continued until November 2018. The hearing took place over multiple days—and spanned several months—concluding in March 2019.

program.  She thought he was "getting A's and B's," but acknowledged his report card showed a range of grades from D's to A's.  Mother noticed F.N. smoking marijuana or drinking alcohol "two or three times before."

Dr. Lapeq Everev, a neuropsychologist, had evaluated the then 20-year-old minor and opined F.N.'s "word and reading comprehension reflected a fifth-grade capacity, equivalent to a 10 or 11-year-old child," and he was "in the 'Intellectual Disability/Mild Mental Retardation' category for 'Intelligence.' "  Dr. Everev testified as an expert in neuropsychology.  A year before the hearing, Dr. Everev "conducted a full battery [of tests] looking at verbal skills, motor functioning, attention, learning, memory and then executive functioning, as well as overall IQ."  "His verbal and academic abilities . . .his knowledge of words, simple reading, and then reading comprehension were all within the borderline range, fifth percentile, equivalent to about the fifth grade ability."  His verbal capacity was at a fifth-grade level, "on par with maybe an 11-year-old."  Dr. Everev also gave F.N. a "global assessment of intelligence" test, and he scored a "69, and that falls in the intellectually disabled, formally known as mild mental retarded range."  Everev stated that "[s]imply put," F.N.'s "overall intellectual functioning" would be assessed "to be that of approximately an 11-year-old" and "consistent with the scores that we had seen prior, at the fifth grade level."

The juvenile court asked numerous questions about the tests Dr. Everev used, including examples of the types of questions he had asked.  On one test, F.N. was asked "What is money used for?  And [the minor] got that correct, to buy things.  [¶] And the second follow-up question was, Why do many foods need to be cooked?  And [the minor's] response was, So that they can be eaten, so he wasn't able to say, you know, so they may give more nutrients, they may taste better, or to avoid—avoid becoming sick."  The

court stated, "That's not a wrong response," to which Everev replied, "Actually, it's insufficient on this test, because you could eat the food without it being cooked." After a series of examples,[5] the court stated "Boy, these are all subject to interpretations. I mean, really, this is very subjective. Whoever created these have [in] their mind of what's going to be right."

Dr. Everev opined F.N. needed "structure and support and guidance." He also spoke about the East Bay Regional Center. While F.N. qualified for the Regional Center, which has a cutoff for services of " '70 and above' " on the IQ scale, Everev was not sure if F.N. would be accepted and even if he was, his IQ score meant "intensive services . . . administered by [the Center would be] atypical"; what they "would likely do is help access services that would be helpful—you know, housing occupation."

Dr. Peggy Holcomb, a "Child and Adolescent Clinical Neuropsychologist," testified as an expert in neuropsychology and behavior in adolescence. Dr. Holcomb had previously worked at DJJ from 2014 to 2016. Her last role involved creating "programs for young men whom [she] had

---

[5] Other examples included: "How are a horse and a tiger alike? And so, a correct response would be 'an animal.' An incorrect response would be 'they both have tails.' So, you want to look at how efficient one's abstraction is." The court responded, "But they're both right. [¶] . . . [¶] I would have said four legs." Or, "How are an anchor and a fence alike, is a harder one." Dr. Everev stated the correct answer was, "They both hold things in," to which the court replied, "They don't hold things in. An anchor does not hold things in." The tests were progressive, meaning they started out simple and got harder, if the person answered correctly. A progressive example might be, how are a "Piano and a drum" alike? F.N. "said instruments; correct answer. Boat and automobile. Both vehicles; correct answer. A nose and a tongue; they're both body parts." The court replied, "So far, he's gotten three right." But Dr. Everev responded, to get full points for the last comparison, minor would have had to say a nose and a mouth are both "associate[d] with the senses."

identified as having neurodevelopment disorders, who were not getting appropriate services." When asked if there were programs at the DJJ which would address F.N.'s disabilities, she replied, "That's what I was trying to put in effect when I left. [¶] But my understanding is it didn't take place." And that, "[c]urrently, as I know it, there's no program for individuals who have intellectual disabilities."

Once again, the court had questions. The court asked Dr. Holcomb how she knew about the current programming at DJJ since she had not worked there since 2016. Holcomb responded, "Just in my ongoing contact with prior colleagues who remain there." The court followed-up, and Holcomb admitted, "things have changed a bit." But based on speaking with her old colleagues "off and on every few months," she did not believe there had been organizational changes involving the "creation of a program for people with intellectual disabilities." But Holcomb also admitted she had no "affirmative knowledge" of what programs were currently available at DJJ.

Dr. Holcomb opined, based on her review of Dr. Everev's evaluation and because she had "no reason to question . . . another clinician," that F.N. "has an intellectual disability, formally known . . . as 'mental retardation.' " She stated individuals with intellectual disabilities were prone to "victimization and exploitation." When the court asked if this could be attributed to "life in general" and that people with intellectual disabilities "[n]o matter where they are, they're going to be more victimized," Holcomb responded, "Sure, absolutely. It's just that the difference in a correctional setting, it's . . . a self-selecting population, where those individuals already don't have regard for other people's property or rights."

Elizabeth Cauffman, a professor of psychological science, testified as an expert on the issue of "Youth Brain Development." Cauffman did not

interview F.N. but instead testified about several studies, including one conducted with 1,000 individuals aged 10 to 30 years old. From this study, she concluded that while adolescents have the same "cognitive" capacity as adults, they do not possess the same maturity or emotional self-regulation. Another study showed adolescents are very reward-focused, as opposed to adults who tend to be more harm-avoidant, and the transition from reward-focused to harm-avoidant usually occurs around age 25. Another study showed the prefrontal cortex—the part of the brain responsible for self-regulation and emotional control—does not fully develop until age 25.

The People, in turn, called Probation Officer Cesar Estrada-Ramirez. Estrada-Ramirez testified about the various programs at DJJ, including Aggression-Interruption Training, "a 10-session course where [youths] learn social skills" to "gain a perspective of other individuals that they might encounter in the community, with the hopes of using the behavior change"; Counterpoint, "a 33-session course which primarily focuses on youths that have been determined to pose a higher risk to reoffend" with the "ultimate goal of reducing recidivism"; Cognitive Behavioral Intervention, "a 38-session course" in which youths "learn social skills to identify triggers, develop alternative plans where they are presented with those triggers in the community to, hopefully, . . . divert them from continued substance abuse"; Skill of the Week, which "continues throughout" a youth's stay at DJJ where they learn to reinforce learned skills despite finishing " 'AIT' or Counterpoint or any other determined treatment" and to "develop coping strategies in order for them to succeed"; and other programs focused on curbing recidivism and providing reentry services.

Estrada-Ramirez did not know "how successful" the programs were "with people with developmental disabilities" and could not identify a

10

"specific program that is geared towards individuals with intellectual disabilities." However, he stated that in his experience the programs are adjusted "based on the necessary needs of a youth while they're there—with intellectual and learning disabilities." Additionally, DJJ contained two "mental health units," where youth "receive services with psychologists and, if need be, they also have a contract with Napa State Hospital . . . that could address any mental health needs." The officer also testified about DJJ's continued education programs. He explained that after the youth completes an educational screening, "they have an opportunity to either obtain their high school diploma or work toward their GED, and once that's been obtained, they have an opportunity to earn college credits" or the "youths are afforded an opportunity" for vocational training. Estrada-Ramirez did not know any "specifics" about the educational programs regarding whether they had a "component that is specific to addressing people that have intellectual disabilities," but stated, that upon minor's initial arrival, DJJ would "make appropriate recommendations to any learning disabilities or educational plans." "In addition to reviewing the initial paperwork and documentation during the orientation process—which is approximately 45 days in the reception center—after receiving psychological and mental health education . . . screenings, a specific case plan is created—and actually forwarded to the county, as well—with information on the specific programming that they will receive based on those results."

After hearing argument by counsel, the juvenile court ordered F.N. committed to DJJ. In so doing, the court recited the basis for its decision. The court found that some of Dr. Everev's questions to F.N. during his evaluation had been "very, very subjective." Although the court was aware of Everev's evaluation that the minor had a mild intellectual disability, the

11

court stated F.N. knew right from wrong and he could "change because [he had] changed" both "intellectually and cognitively," and that "with intensive treatment geared to his abilities, he will continue to progress." And, while Dr. Holcomb presented "very interesting testimony," the court found she was "certainly not current on the Department of Juvenile Justice" and her "reasoning" was "based on her inaccurate knowledge."

The court also stated it had "considered all the alternatives," but determined F.N. needed "an intensive, structured program" and given his "needs," his age, "and given the time that we would have with him," neither the Ranch or the Youth Offender Treatment Program were appropriate. The court then went through the programs that would be of benefit to the minor, including the victim empathy program so that minor could "understand—the ramifications of what he did and what he could do in the future"; the programs "available to minor for guidance, for decision-making, and decision-making skills"; those aimed at helping to change his "patterns of thinking" and "at reducing aggression and anger"; and finally the "educational programs" and "advantages in career and work incentive programs." Additionally, the court observed that "all the while, during these programs, he will be getting the intensive help that he needs, at least more so than I can think of in any other thing available." The juvenile court committed F.N. for a maximum time of 52 years, with credit for time served and with "no more than three years" per Welfare and Institutions Code section 731.

DISCUSSION

*DJJ Commitment*

F.N. maintains the juvenile court abused its discretion in committing him to DJJ because "not a scintilla of evidence was presented during the disposition hearings, or in the probation report, to establish that the DJJ

12

programs will provide any benefit to an individual, like [himself], who has an intellectual disability."

Juvenile justice law specifies that minors "shall, in conformity with the interests of public safety and protection, receive care, treatment, and guidance that is consistent with their best interest, that holds them accountable for their behavior, and that is appropriate for their circumstances." (Welf. & Inst. Code, § 202, subd. (b).) We review a juvenile court's decision to commit a minor to the DJJ for an abuse of discretion. (*In re Robert H.* (2002) 96 Cal.App.4th 1317, 1329–1330 (*Robert H.*); *In re Asean D.* (1993) 14 Cal.App.4th 467, 473 (*Asean D.*); see *In re Emmanuel R.* (2001) 94 Cal.App.4th 452, 465 [" ' " 'The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court.' " ' "].)

"A DJJ commitment is not an abuse of discretion where the evidence demonstrates a probable benefit to the minor from the commitment and less restrictive alternatives would be ineffective or inappropriate." (*In re M.S.* (2009) 174 Cal.App.4th 1241, 1250.) "We must indulge all reasonable inferences to support the decision of the juvenile court and will not disturb its findings when there is substantial evidence to support them." (*In re Michael D.* (1987) 188 Cal.App.3d 1392, 1395.) Substantial evidence is " 'evidence which is reasonable, credible, and of solid value. . . .' " (*In re Paul C.* (1990) 221 Cal.App.3d 43, 52.)

In *In re Carlos J.* (2018) 22 Cal.App.5th 1 (*Carlos J.*), the court discussed the showing required to support a commitment to the DJJ. "Where a minor has particular needs, the probation department should [] include *brief* descriptions of the relevant programs to address those needs." (*Id.* at p.

12.)  The probation department is not required, however, "in its report and initial testimony to provide *in depth information* about the DJF's programs or to preemptively respond to even predictable criticism of the DJF."  (*Id.* at p. 13, italics added.)  "The People bear the burden of showing the appropriateness of a proposed placement."  (*Id.* at p. 12.)  If this "initial burden" is met by the People, the burden then shifts to the minor.  "If a minor wishes to dispute the availability or efficacy of particular programs, or to suggest that other conditions at the DJF undermine the programs, the minor must present sufficient evidence to reasonably bring into question the benefit he or she will receive from the adoption of the probation department's recommendation."  (*Id.* at p. 13.)  Finally, if the minor provides such sufficient evidence—either through submitted materials or testimony—and it "raises concerns about a particular aspect of DJF" (Seiser & Kumli, Cal. Juvenile Courts Practice & Procedure (2020) § 3.96, at p. 3-246), then it may be necessary "for the People to provide additional information to the juvenile court in order for the court to make a properly supported finding of probable benefit."  (*Carlos, J.,* at p. 14.)

Although F.N. relies on *Carlos J.* to support his assertion the juvenile court abused its discretion in the instant case, his reliance on the case is misplaced.  In *Carlos J.,* the Court of Appeal reversed a commitment to DJJ given the lack of showing of *any* programs offered.  (*Carlos J., supra,* 22 Cal.App.4th at pp. 10–12.)  In contrast here, the probation department provided information—both in the probation report and through testimony— about numerous programs that would benefit F.N., including programs designed toward victim empathy, social skills and decision-making and testified that in his experience "adjustments based on the necessary needs of a youth while they're there—with intellectual and learning disabilities"—

14

could be made to those programs.  Accordingly, here, the People amply met its "initial burden."

Under *Carlos J.*, it then became the minor's burden to show the inefficacy or unavailability of programs or acceptable modification of existing programs.  F.N. contends the "evidence demonstrated" that rather than benefit minor," a DJJ commitment "would exacerbate his issues" and have "negative impact" on him because "he would likely not be able to take advantage of many of the DJJ programs and would be more susceptible to negative influences given his cognitive challenges."  He points to Dr. Holcomb's testimony that minors with "intellectual disabilities prior to the age of 25" are more prone to "[v]ictimization and exploitation" and there are "no specific measures" at DJJ "directed toward protecting individuals with disabilities," and her testimony that based on her "time there and subsequent information [she had] received" there are no specific programs "geared towards treatment of developmentally-disabled individuals" at DJJ.

The juvenile court, however, while finding Dr. Holcomb's testimony "very interesting," did not credit her opinion, as she was "certainly not current on the Department of Juvenile Justice" and her "reasoning" was "based on her inaccurate knowledge."  Furthermore, the court also heard from the probation officer, who testified F.N. would receive an individualized treatment plan upon arrival and orientation, and his educational needs would be evaluated, and educational services could be accommodated to address any needs he had.

In short, F.N.'s briefing assumes the juvenile court was required to accept Dr. Holcomb's opinion and reject the testimony of the probation officer. However, "[t]he court was not required to take all the information properly considered by it at face value.  The court was entitled to evaluate . . . the

15

weight to be afforded to the psychological evaluation, as well as to accept or reject the recommendations of the probation officer." (See *In re Robert H., supra*, 96 Cal.App.4th at p. 1329.)

Minor further asserts, citing *In re Aline D.* (1975) 14 Cal.3d 557[6], "the negative impact of a DJJ commitment on an unsophisticated individual like [minor] has been well documents for years." Not only has it been 45 years since *Aline D.* was decided, but that case does not, in any event, provide an evidentiary basis to disregard the evidence provided by the probation department in this case. Further, DJJ must accept a minor if it "believes that the ward can be materially benefited by the division's reformatory and educational discipline, and if the division has adequate facilities, staff, and programs to provide that care" (Welf. & Inst. Code, §§ 736, subd. (a), 1731.5, subd. (b)), and therefore must reject wards it concludes could not be materially benefited. Dr. Holcomb, herself, testified that during her time at DJJ, she evaluated 50 to 200 wards, and "between four and eight or nine" were youths she "thought were so extremely low functioning that they would not program well" at DJJ and they were not accepted. She further recalled a ward "who had already been placed" at DJJ, and "after watching how they functioned, [she] made [the] recommendation that they be moved, and they were."

In sum, the record here adequately supports the juvenile court's determination that the DJJ would provide F.N. with the "structured" and "supportive environment" he needs and can afford him the appropriate means to develop both "intellectually and cognitively," as he has done in the past "with intensive treatment." (*In re Jonathan T.* (2008) 166 Cal.App.4th 474,

---

[6] Superseded by statute on another ground as stated in *In re Luisa Z.* (2000) 78 Cal.App.4th 978, 987–988.

16

486 ["A juvenile court must determine if the record supports a finding that it is *probable* the minor will benefit from being committed to DJJ. [Citation.] . . . There is no requirement that the court find exactly how a minor will benefit from being committed to DJJ."].)

### *Penal Code Section 654*

F.N. also asserts that because "the taking of [the] vehicle and other personal belongings occurred in a single transaction with a single objective—to deprive [all three girls] of all of their property—Penal Code section 654 prohibited punishment for both the carjacking and [the] robbery of the [car owner]."

Penal Code section 654 provides in part, "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision. An acquittal or conviction and sentence under any one bars a prosecution for the same act or omission under any other." (Pen. Code, § 654, subd. (a).)

Plainly stated, Penal Code section 654 prohibits multiple punishment for a single act or indivisible conduct. (*People v. Reyes-Tornero* (2016) 4 Cal.App.5th 368, 376.) " 'Whether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of [Penal Code] section 654 depends on the intent and objective of the actor. If all the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one. [¶] . . . [¶] If, on the other hand, defendant harbored, "multiple criminal objectives," which were independent of and not merely incidental to each other, he may be punished for each statutory violation committed in pursuit of each objective, "even

17

though the violations shared common acts or were parts of an otherwise indivisible course of conduct." ' " (*People v. Rodriguez* (2015) 235 Cal.App.4th 1000, 1005.)

Whether Penal Code section 654 " 'applies in a given case is a question of fact for the trial court, which is vested with broad latitude in making its determination. [Citations.] Its findings will not be reversed on appeal if there is any substantial evidence to support them. [Citations.] We review the trial court's determination in the light most favorable to the respondent and presume the existence of every fact the trial court could reasonably deduce from the evidence.' " (*People v. Vang* (2010) 184 Cal.App.4th 912, 915–916.)

Defendant relies on *People v. Bauer* (1969) 1 Cal.3d 368 (*Bauer*), *People v. Lewis* (2008) 43 Cal.4th 415 (*Lewis*), overruled in part on another ground as stated in *People v. Black* (2014) 58 Cal.4th 912, 919, and *Asean D., supra*, 14 Cal.App.4th 467, in support of his assertion the trial court should have stayed the sentence for carjacking.

In *Bauer*, after gaining admittance to the victims' home under false pretenses, the defendant drew a gun and forced two of the victims to lie face [down] on the floor and tied the third to a chair. (*Bauer, supra*, 1 Cal.3d at p. 372.) Over the course of "about two hours," the three victims "observed defendant and his accomplice ransack the house and carry the loot to the garage" and then drive away in one of the victim's cars. (*Ibid.*) A jury found the defendant guilty of first degree robbery, first degree burglary, grand theft and automobile theft, and the trial court gave the defendant concurrent sentences for the robbery and auto theft convictions. (*Id.* at pp. 371–372.) On appeal, the defendant asserted it was "improper," under Penal Code section 654, to punish him for both the robbery and the auto theft. (*Id.* at

18

p. 375.) The Supreme Court agreed. The court held the taking of the vehicle was incidental to the robbery, stating "where a defendant robs his victims in one continuous transaction of several items of property, punishment for robbery on the basis of the taking of one of the items and other crimes on the basis of the taking of the other items is not permissible." Additionally, the court noted the "crime of automobile theft is not a crime of violence but is a violation of property interests" similar to that of robbery. Therefore, the court held "proscription against double punishment" precluded "punishment for this offense in the circumstances of the present case." (*Id.* at pp. 377–378.)

The People point out *Bauer* involved auto theft and not carjacking, and that in *People v. Capistrano* (2014) 59 Cal.4th 830 (*Capistrano*), overruled on another ground as stated in *People v. Hardy* (2018) 5 Cal.5th 56, the Supreme Court distinguished *Bauer* on that basis.

In *Capistrano*, two armed men confronted and demanded money from a woman and her husband as they pulled into their garage. (*Capistrano, supra,* 59 Cal.4th at p. 841.) One man then motioned for the wife to exit the vehicle, and the two men led the victims into the house and bedroom where they bound them. (*Ibid.*) Two additional men then arrived at the house. The defendant took the wife into the bathroom and twice forced her to orally copulate him and twice raped her. (*Ibid.*) The four men eventually left taking various items from the home and the victims' car. (*Id.* at p. 842.) A jury convicted the defendant of carjacking, robbery, rape and forcible oral copulation during the robbery. (*Id.* at p. 838.) On appeal, the defendant contended the consecutive sentences for the carjacking and the robbery violated Penal Code section 654. (*Id.* at p. 885.)

The Supreme Court disagreed. In doing so, the court distinguished *Bauer* which had involved auto theft, with the defendant's conviction for carjacking. The court stated, " ' " 'Carjacking' is the felonious taking of a motor vehicle in the possession of another, from his or her person or immediate presence, or from the person or immediate presence of a passenger of the motor vehicle, against his or her will and with the intent to either permanently or temporarily deprive the person in possession of the motor vehicle of his or her possession, accomplished by means of force or fear." ' [Citations.] . . . Carjacking is thus distinct from ordinary automobile theft because it is a crime accomplished by fear or force. . . ." And unlike *Bauer*—a decision "rendered before the enactment of the carjacking statute"— carjacking "is a crime of violence, distinct from robbery, and not merely a violation of the victims' property interest in their motor vehicle." (*Capistrano, supra*, 59 Cal.4th at pp. 886–887.)

Additionally, the court rejected the defendant's attempt to "cast [the] carjacking convictions as vehicle thefts that were part and parcel of a single course of conduct, beginning when the victims were removed from their cars and ending only when defendants left with the stolen items, which included the vehicles." (*Capistrano, supra*, 59 Cal.4th at p. 887.) The court affirmed the jury's "conclusion that defendant harbored separate objectives" in convicting the defendant of "two distinct crimes of violence." The court held that "temporal proximity of the two offenses" was "insufficient by itself to establish . . . a single objective," and that the defendant had confronted the victims "at two points"—the car and inside the residence—and the "elevation of the threat to the victims by forcing them into their homes where defendant committed additional crimes amounts to a separate criminal objective." (*Ibid.*)

F.N. maintains *Capistrano* is inapposite because he "possessed a single intent—to relieve the victims of their cell phones, purses, and vehicle—and did so during a single confrontation," all of which occurred in a relatively short time span and at a single location. To begin with, this overlooks the Supreme Court's distinction between auto theft and carjacking. As in *Capistrano*, the instant case involves carjacking, which was accomplished here not just by demanding M.V.'s keys, but by pointing a gun at her and firing a shot over her head, when she was a mere four feet away from the car door.

Further, as *Capistrano* states, "temporal proximity" is "insufficient by itself to establish . . . a single objective. (*Capistrano, supra*, 59 Cal.4th at p. 887.) Here, R.R. and F.N. first harried the three girls, then R.R. stole G.R.'s cell phone, and then F.N. took G.R.'s purse. Then the boys pulled out guns and demanded that the other two girls turn over their cell phones and belongings. And it was after that, that the two boys demanded M.V.'s car keys. Thereafter, they made their way back to the car, with M.V. following and pleading with them not to take the car. R.R. finally told her to back off, and after that, when he reached the driver's side door and was only about four feet away from M.V., he pointed his gun at her and fired a shot over her head. On this record, the juvenile court could conclude F.N. had, over the course of the encounter with the girls, "multiple criminal objectives," which were independent of, and not merely incidental to, each other.

In *Lewis*, the defendant and his codefendants forced their way into various victims' cars at gunpoint and then drove with the bound victims to different banks or stores forcing them to withdraw money. The defendant would then either abandon or kill the victims, and sometimes took parts from the victims' cars. (*Lewis, supra*, 43 Cal.4th 415, 434–438.) A jury convicted

21

the defendant of robbery, simple kidnapping, and kidnapping to commit robbery of six victims. (*Id.* at p. 518.) On appeal, the defendant maintained Penal Code section 654 barred "multiple punishments for both the kidnappings for robbery and the robberies of each of the victims." The Supreme Court agreed. (*Lewis,* at p. 519.) The court held "the kidnappings for robbery and the robberies of each victim were committed 'pursuant to a single intent or objective,' that is, to rob the victims of their cars and/or cash from their bank accounts." (*Ibid.*)

The circumstances here are different. In *Lewis,* the charged crime was kidnapping for robbery. Thus, the kidnappings of the victims while in their cars were perpetrated for the purpose of robbery and were also the means by which the robberies were accomplished by forcing the victims to withdraw money at different banks and stores. Here, in contrast, the carjacking did not facilitate the robberies of the three girls. Nor, conversely, did the theft of M.V.'s cell phone, which occurred before the boys demanded the car keys—let alone, before they walked back to the car with M.V. following, and R.R. raised his gun on reaching the car and fired a shot over M.V's head at a range of only four feet—facilitate the carjacking.

In *Asean D.*, the minor and two companions "broke into an occupied van in a parking lot" and "dragged out the male victim, and one of the three kicked him in the face." The minor, who had a handgun, threatened the female victim, who was "also knocked to the ground." After a "search for the keys, the three minors escaped with the van." (*Asean D., supra,* 14 Cal.App.4th at p. 471.) The minor admitted two counts of robbery and one count of unlawful taking of a vehicle. (*Ibid.*) On appeal, he argued the juvenile court erred in imposing separate terms for both robberies and the unlawful taking. (*Id.* at p. 474.) The appellate court agreed stating,

"[a]lthough a small amount of the male victim's personal property was also taken inside the van, it is clear that the robberies were committed for the purpose of taking the vehicle and constituted a single transaction; there was no separate criminal objective in the brutalizing of the victims beyond compelling them to give up their property." (*Id.* at p. 475.)

The facts here are different. Whereas in *Asean D.*, the minor broke into an occupied vehicle, dragged the victims outside the van, took the keys, and re-entered the van and drove off, here R.R. and F.N. engaged in different conduct, a good part of which was not *for the purpose of* stealing the car. On the contrary, unlike in *Asean D.*, where the minor and his companions inadvertently drove off with a "small amount" of the victim's personal property, R.R. and F.N. did not inadvertently steal a few inconsequential items. They first stole G.R.'s cell phone, then stole her purse, and then stole the belongings of the other two girls. It was only after that that R.R. and F.N. demanded the car keys from M.V. and after she had trailed them back to the car begging them not to take the car, that R.R. told her to back off and then shot at her.

Accordingly, we cannot say the juvenile court violated Penal Code section 654 by imposing sentences for both the robbery of M.V. and the carjacking.

## DISPOSITION

The juvenile court's orders are AFFIRMED.

23

_____
Banke, J.


We concur:


_____
Margulies, Acting P.J.


_____
Sanchez, J.


A156834, In re FN